**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**JANVIERE CARLIN**                    :
93 Londonderry Way                      :
Uxbridge, MA 01569                      :          Case No. 22-cv-_____
757-274-3406                            :
                                        :
**JEFFERY CHANDLER**                   :
8263 Minton Ct.                         :
Millersville, MD 21108                  :          Case: 1:22–cv–00800
443-370-7428                            :          Assigned To : Cooper, Christopher R.
                                        :          Assign. Date : 3/15/2022
**BETH ELLIS**                         :          Description: Pro Se Gen. Civil (F-DECK)
128 Milk St.                            :
Blackstone, MA 01504                    :
860-912-1284                            :
                                        :
**CRISTINA FIELD**                     :
1155 Dewees St.                         :
Sumter, SC 29150                        :
334-669-9452                            :
                                        :
**GREGORY RAMOLA**                     :
5828 Stafford Springs Trail             :
Orlando, FL 32829                       :
407-694-2767                            :
                                        :
**KURT SCHUSTER**                      :
83 White Tail Run                       :
Hopkinton, NH 03229                     :
517-404-8581                            :
                                        :
**HAL CHRISTOPHER SIMS**               :
604 Green Meadow St. N.                 :
Colleyville, TX 76034                   :
817-875-4259                            :
                                        :
**NATHAN ALEXANDER TOWN**              :
6119 Whimbrelwood Dr.                   :
Lithia, FL 33547                        :
253-389-3217                            :

1

**JEAN-MICHEL TROUSSE**                    :
1913 NE 21st St.                          :
Fort Lauderdale, FL 33305                 :
678-778-3777                              :
                                          :
**COLLIER YARISH**                        :
2185 3rd Pl. SW                           :
Vero Beach, FL 32962                      :
772-480-8348                              :
                                          :
    Plaintiffs,                     :
                                          :
v.                                        :
                                          :
**CENTERS FOR DISEASE**                   :
**CONTROL & PREVENTION**                  :
1600 Clifton Rd.                          :
Atlanta, GA 30329                         :
                                          :
**DEPARTMENT OF HEALTH &**                :
**HUMAN SERVICES**                        :
200 Independence Ave., SW                 :
Washington, DC 20201                      :
                                          :
Defendants.                               :

## COMPLAINT

### I. STATEMENT OF THE CASE

Ten commercial airline pilots bring this suit to vacate and permanently enjoin enforcement

of the Federal Transportation Mask Mandate ("FTMM")[1] put into place by orders of the Centers

---

[1] The *ultra vires* Federal Transportation Mask Mandate consists of: 1) Executive Order 13998, 86 Fed. Reg. 7,205 (Jan. 26, 2021); 2) Department of Homeland Security Determination 21-130 (Jan. 27, 2021); 3) Centers for Disease Control & Prevention Order "Requirement for Persons to Wear Masks While on Conveyances & at Transportation Hubs," 86 Fed. Reg. 8,025 (Feb. 3, 2021); 4) Transportation Security Administration Health Directives 1542-21-01C, 1544-21-02C, and 1582/84-21-01C (Jan. 19, 2022); and 5) TSA Emergency Amendment 1546-21-01C (Jan. 19, 2022). Only the CDC order is challenged in this Complaint since it appears the Courts of Appeals have jurisdiction over the TSA Health Directives and Emergency Amendment and the president's executive order can be challenged by suing the agencies he directed to carry it out.

for Disease Control & Prevention ("CDC") – under the purported authority of its parent agency, the Department of Health & Human Services ("HHS") (collectively "the defendants").

By mandating masks for all American travelers and employees in the transportation sector, the defendants have acted without statutory authorization or following the rulemaking process required by the Administrative Procedure Act ("APA"). This mandate also raises serious constitutional concerns. Because of the FTMM, numerous state, local, and regional transportation and airport authorities are told to enforce a federal mandate that is in direct conflict with the laws and policies of all 50 states that prohibit mask mandates or do not require face coverings.

The Court should vacate worldwide[2] the FTMM because it is an illegal and unconstitutional exercise of executive authority. The mask mandate is procedurally defective because the defendants adopted it without following the APA's notice-and-comment requirements or considering the impact on tens of millions of travelers and transportation workers every single day. They also ignored countless scientific and medical studies and articles showing that face masks are totally ineffective in reducing coronavirus spread but are harmful to human health in at least 68 ways. Congress never intended for the Executive Branch to have the authority to promulgate this policy – and even if it did, it's unconstitutional. CDC and HHS may not exercise their authority in a manner that is inconsistent with the administrative structure that Congress enacted.

As pilots for major airlines, we have seen up close and personal the chaos in the sky created by the FTMM, with thousands of reports to the Federal Aviation Administration ("FAA") of "unruly" passenger behavior since the FTMM took effect Feb. 1, 2021 – nearly all of which have been

---

[2] The FTMM purports to apply aboard flights to and from the United States, even when the aircraft is outside U.S. airspace. It likewise applies to ships calling on U.S. ports even when such vessels are in the open sea thousands of miles from American shores, far outside U.S. jurisdiction.

caused by incidents related to masks. We have serious concerns about the safety implications of the mask mandate, none of which were studied by CDC or HHS as the policy was rushed into place only 12 days after the inauguration of a new president who made a national mask mandate a top campaign promise – even though he acknowledged it was likely unconstitutional.

The defendants have illegally failed to give passengers and employees our legally guaranteed option under the Food, Drug, & Cosmetic Act ("FDCA") to refuse to use a medical device (face mask) not approved by HHS' Food & Drug Administration ("FDA") or allowed only under an Emergency Use Authorization ("EUA").

## II. PARTIES

Lead Plaintiff Janviere Carlin is a pilot for JetBlue Airways. She resides at 93 Londonderry Way, Uxbridge, MA 01569. Her declaration is at Ex. 1.

Plaintiff Jeffery Chandler is a pilot for Southwest Airlines. He resides at 8263 Minton Ct., Millersville, MD 21108. His declaration is at Ex. 2.

Plaintiff Beth Ellis is a pilot for JetBlue Airways. She resides at 128 Milk St., Blackstone, MA 01504. Her declaration is at Ex. 3.

Plaintiff Cristina Field is a pilot for PSA Airlines, a wholly owned subsidiary of American Airlines that operates under the brand name "American Eagle." She resides at 1155 Dewees St., Sumter, SC 29150. Her declaration is at Ex. 4.

Plaintiff Gregory Ramola is a pilot for JetBlue Airways. He resides at 5828 Stafford Springs Trail, Orlando, FL 32829. His declaration is at Ex. 5.

Plaintiff Kurt Schuster is a pilot for JetBlue Airways. He resides at 83 White Tail Run, Hopkinton, NH 03229. His declaration is at Ex. 6.

Plaintiff Hal Christopher Sims is a pilot for American Airlines. He resides at 604 Green Meadow St. N., Colleyville, TX 76034. His declaration is at Ex. 7.

Plaintiff Nathan Alexander Town is a pilot for JetBlue Airways. He resides at 6119 Whimbrel-wood Dr., Lithia, FL 33547. His declaration is at Ex. 8.

Plaintiff Jean-Michel Trousse is a pilot for JetBlue Airways. He resides at 1913 NE 21st St., Fort Lauderdale, FL 33305. His declaration is at Ex. 9.

Plaintiff Collier Yarish is a pilot for JetBlue Airways. He resides at 2185 3rd Pl. SW, Vero Beach, FL 32962. His declaration is at Ex. 10.

Defendant Centers for Disease Control & Prevention is an agency of HHS. It is headquartered at 1600 Clifton Rd., Atlanta, GA 30329.

Defendant Department of Health & Human Services is a department of the Executive Branch. It is headquartered at 200 Independence Ave., SW, Washington, DC 20201.

### III. JURISDICTION, VENUE, & STANDING

The Court has jurisdiction under 28 USC § 1331: "The district courts shall have original juris-diction of all civil actions arising under the Constitution, laws, or treaties of the United States."

The Court has the authority to grant declaratory relief and to vacate the FTMM under the Declaratory Judgment Act, the APA, and the Court's inherent equitable powers. 28 USC §§ 2201 & 2202; 5 USC §§ 702 & 706.

Venue is proper in this judicial district because HHS is headquartered in the District of Colum-bia. "A civil action in which a defendant is … an agency of the United States … may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides…" 28 USC § 1391(e)(1).

We have standing to sue the defendants because the FTMM applies to us as workers in the transportation sector and we have been ordered to enforce the mask mandate even though we are not law-enforcement officers or employees of CDC or HHS. A court order declaring unlawful and setting aside the FTMM would redress our injuries because our freedom to work without covering our faces would be restored, and we would no longer be called into service of the federal government as the "mask police."

### IV. STATEMENT OF FACTS

**A. We are subject to the Federal Transportation Mask Mandate as employees in the nation's transportation sector and are mandated to enforce the policy despite our objections.**

1. All plaintiffs have submitted declarations in support of this Complaint, which are attached hereto as Exs. 1-10 and incorporated herein by reference.

**B. Defendant HHS' COVID-19 pandemic declarations.**

2. The secretary of HHS declared COVID-19 a public-health emergency in the United States under § 319 of the Public Health Service Act ("PHSA") on Jan. 31, 2020. Ex. 11; *see also* 42 USC § 247(d).

3. A § 319 determination remains in effect for 90 days or until the secretary determines that the emergency no longer exists, whichever occurs first. If the same or additional conditions continue to warrant a public-health emergency, the secretary may renew the determination for additional 90-day periods without end. Ex. 11.

4. The Public Health Emergency Declaration for COVID-19 has been renewed numerous times, most recently effective Jan. 16, 2022, by HHS Secretary Xavier Becerra. Ex. 12.

5. Per the 90-day limit, the current emergency declaration expires April 16, 2022 (however it appears HHS can extend it indefinitely so long as it believes COVID-19 presents a public-health emergency). *Id*.

**C. Federal Transportation Mask Mandate.**

6. **PRESIDENTIAL ACTION:** The day after taking office (Jan. 21, 2021), President Joseph Biden issued "Executive Order Promoting COVID-19 Safety in Domestic & International Travel." E.O. 13998; 86 Fed. Reg. 7205 (Jan. 26, 2021); Ex. 13. This executive order set in motion the FTMM issued by CDC and HHS as well as other federal agencies.

7. President Biden's action marked an abrupt change of policy from the former administration. The Department of Transportation ("DOT") "in October [2020] rejected a petition to require masks on airplanes, subways, and other forms of transportation, with Secretary Elaine Chao's general counsel saying the department 'embraces the notion that there should be no more regulations than necessary.'" Ex. 14.

8. "The nation's aviation regulator has deferred to airlines on masks, with Federal Aviation Administration chief Stephen Dickson telling senators at a June [2020] hearing 'we do not plan to provide an enforcement specifically on that issue.'" *Id*.

9. **DHS ACTION:** To carry out E.O. 13998, the Department of Homeland Security ("DHS") issued Determination 21-130 on Jan. 27, 2021: "Determination of a National Emergency Requiring Actions to Protect the Safety of Americans Using & Employed by the Transportation System." Ex. 15.

10. DHS directed its agency TSA to take actions to enforce CDC's FTMM order. *Id.*

11. **CDC ACTION:** Without providing public notice or soliciting comment, CDC – an agency within HHS – issued an order "Requirement for Persons to Wear Masks While on Conveyances & at Transportation Hubs" on Feb. 1, 2020, effective immediately. 86 Fed. Reg. 8,025 (Feb. 3, 2021). Ex. 16. This is the mask mandate we challenge in this Complaint.

12. "This Order will remain in effect unless modified or rescinded based on specific public health or other considerations, or until the Secretary of Health and Human Services rescinds the determination under section 319 of the Public Health Service Act (42 U.S.C. 247d) that a public health emergency exists." *Id.*

13. As authority for the FTMM, CDC invoked § 361 of the Public Health Service Act (42 USC § 264) and CDC regulations implementing that statute (42 CFR §§ 70.2, 71.31(b), & 71.32(b)). *Id*.

14. CDC's FTMM order applies to wholly intrastate transportation, including flights within a state's border as well as taking an airport or hotel shuttle, rideshare, city bus, subway, or other mode of transit less than one mile – or even just sitting alone at a bus stop or train station reading a newspaper or talking on a cellphone without any intent to travel. *Id*.

15. "This Order applies to persons on conveyances and at transportation hubs **directly operated by U.S. state,** local, territorial, or tribal **government authorities**, as well as the operators themselves. **U.S. state**, local, territorial, or tribal **government authorities directly operating conveyances and transportation hubs may be subject to additional federal authorities or actions**, and are encouraged to implement additional measures enforcing the provisions of

this Order regarding persons traveling onboard conveyances and at transportation hubs operated by these government entities." *Id.* (emphasis added to illustrate 10th Amendment problems).

16. CDC's FTMM order makes numerous false claims about the effectiveness of face coverings. *Id*.

17. The order fails to note that the scientific consensus for decades has been that face masks do not reduce the transmission of respiratory viruses and that covering one's face causes at least 68 harms to human health. *See* 228 scientific studies, medical articles, and videos at https://bit.ly/masksarebad.

18. CDC's FTMM order contradicts numerous World Health Organization recommendations and standards, including that children under six should ***never*** wear masks. Ex. 17.

19. "Individuals traveling into or departing from the United States, traveling interstate, **or traveling entirely intrastate**, conveyance operators that transport such individuals, and transportation hub operators that facilitate such transportation, must comply with the mask-wearing requirements set forth in this Order." *Id*. (emphasis added to illustrate 10th Amendment problem).

20. Without citing any authority allowing it to delegate its supposed statutory and regulatory authority to an agency contained in a department outside of HHS, CDC's order includes a provision that "To address the COVID-19 public health threat to transportation security, this Order shall be enforced by the Transportation Security Administration…" *Id.*

21. **TSA ACTIONS:** Based on CDC's questionable delegation of its authority to an agency contained in a separate executive department, TSA issued three "Security Directives" (more accurately labeled "Health Directives") and one Emergency Amendment Feb. 1, 2021, to transportation operators requiring them to vigorously enforce the mask mandate. These four orders were effective until May 11, 2021, and have been renewed four times until April 18, 2022.

**D. Congress has never enacted a mask mandate.**

22. CDC and HHS' imposition of the FTMM goes against the express wishes of Congress. The Legislative Branch has explicitly failed to mandate masks in any setting, including the transportation sector. This shows clear, unambiguous congressional intent.

23. The federal legislative response to coronavirus has been enormous with dozens of bills related to the COVID-19 pandemic enacted into law.

24. Not a single provision in any of the enacted bills grant CDC and HHS the authority to require face masks.

25. Numerous bills have been introduced in Congress to require masks in the transportation sector. None have been passed out of committee in either chamber.

26. Today (March 15) the Senate voted 57-40 to pass Senate Joint Resolution 37 disapproving of CDC's FTMM order. Ex. 119.

**E. CDC and HHS ignore that the mask mandate impairs pilots' health, imperiling aviation safety.**

27. Pilots' health is strictly governed by regulations issued by the Federal Aviation Administration. Ex. 21.

28. We are prohibited from operating an aircraft during any period of medical deficiency. However, we are required to comply with the FTMM, which causes known medical deficiencies.

29. "[N]o person who holds a medical certificate issued under part 67 of this chapter may act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person: … (1) Knows or has reason to know of any medical condition that would make the person unable to meet the requirements for the medical certificate necessary for the pilot operation…" 14 CFR § 61.53(a).

30. As stated in our sworn declarations, wearing a mask before and during flight causes us numerous medical deficiencies. Exs. 1-10.

31. "[A] person shall not act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person knows or has reason to know of any medical condition that would make the person unable to operate the aircraft in a safe manner." 14 CFR § 61.53(b).

32. As stated in our sworn declarations, wearing a mask before and during flight causes us to feel we are unable to operate the aircraft in a safe manner. Exs. 1-10. Yet due to the FTMM and our companies' enforcement thereof, we are forced to fly anyway.

33. "Each flight crew member must report for any flight duty period rested and prepared to perform his or her assigned duties." 14 CFR § 117.5(a).

34. As stated in our sworn declarations, wearing a mask before the flight (for example, while in an airport terminal) makes us feel like we are not fully prepared to perform our assigned duties, including due to fatigue. Exs. 1-10.

35. "Extended wearing of [a] mask, which has become a part of routine life, has led to the emergence of 'mask fatigue.' Mask fatigue is defined as the lack of energy that accompanies, and/or follows prolonged wearing of a mask." Ex. 22.

36. Forced masking "is considered as an impediment to professional work as well. This is because of the newly emerging condition, mask fatigue." *Id*.

37. "We define mask fatigue as the lack of energy that accompanies, and/or is a consequence of extended use of a mask." *Id*.

38. "There is published evidence which shows that extended wearing of mask impairs functioning…" *Id*.

39. Aspects of mask fatigue include pressure/pain over ears, cheeks, and nose; skin breakdown; aggravation of acne; itching; contact dermatitis; voice fatigue; laryngitis; sore throat; respiratory compromise; Hypoxia; Hypercapnia; increased work of breathing; dizziness; headache; irritability; physical exhaustion; decreased concentration/work efficiency; confusion and disorientation; breathlessness; reduced fluid and food intake; chronic health effects on renal and metabolic functions; aggravation of anxiety, depression, and feeling of impending doom; claustrophobia; impaired social interaction/recognition; and maskophobia. *Id*.

40. "The consequences of a negligent or wrongful certification, which would permit an unqualified person to take the controls of an aircraft, can be serious for the public...," according to FAA's Guide for Aviation Medical Examiners. Ex. 21.

41. We all must see an FAA certified doctor ("Aviation Medical Examiner" or "AME") 1-2 times each year. Pilots are all obligated by law (49 USC § 46310, which imposes criminal penalties) to disclose any disqualification condition pertaining to obtaining or maintaining our medical

certificate. If we know that masks are unhealthy for us and their continued use can cause cumulative harm (as evidenced by years of unbiased scientific studies prior to COVID-19 politicization), we are morally and legally obligated to abstain and/or report.

42. The number of hours we may work in a day is controlled by law. "A Flight Duty Period includes the duties performed by the flight crew member on behalf of the certificate holder that occur before a flight segment or between flight segments without a required intervening rest period." 14 CFR § 117.3.

43. The FTMM forces us to obstruct our oxygen intake, causing diminished mental and physical capacity, during our Flight Duty Period.

44. When we as pilots travel on a commercial flight as a passenger not paying for a ticket, we are referred to as "jumpseaters" since we may occupy an additional seat in the cockpit called a "jumpseat." If that seat is already occupied or there are regular seats open in the cabin, we may be seated in a passenger seat.

45. When we are on duty and flying in a jumpseat or passenger seat, this is referred to as "deadheading."

46. "Deadhead transportation means transportation of a flight crew member as a passenger or non-operating flight crew member by any mode of transportation, as required by a certificate holder, excluding transportation to or from a suitable accommodation. All time spent in deadhead transportation is duty and is not rest." *Id*.

47. When we travel as a jumpseater or are deadheading, we are considered an additional crewmember. Ex. 21.

48. "Even when not in uniform, remember that you are still considered an additional crewmember and you may be required to assist on the flight deck or in the cabin in case of unusual or emergency circumstances. You must remain prepared to assist the flight crew should the need arise." *Id*.

49. However, due to the FTMM, we are forced to wear masks when traveling as a jumpseater, which diminishes our mental and physical capacities to be able to assist the flight crew should an emergency occur.

50. "Since masking impairs our ability when conducting a flight as evidenced by the fact that we are not required to wear a mask when flying, it also impairs our fitness for flight when acting in other required capacities." *Id*.

51. DOT, which includes FAA, notes that "the failure to wear a face covering is not itself a federal violation," contradicting the FTMM. *Id*.

52. FAA recognizes the dangers of forced masking: "Air carriers should complete a safety risk assessment and provide guidance to their crewmembers on procedures for the use of masks as they may affect the donning of oxygen masks or conducting other safety functions on the flight deck or in the cabin." FAA Safety Alert for Operators 20,009 (May 25, 2021); Ex. 23.

**F. CDC and HHS ignore that mask mandates have created chaos in the sky, recklessly endangering aviation safety and security.**

53. The defendants fail to take into account that in addition to the millions of Americans who can't safely obstruct their breathing because of a medical condition, tens of millions of Americans vehemently object to anyone ordering them to wear face masks. This is evidenced by

some 5,981 incidents of "unruly" behavior aboard airplanes reported to the Federal Aviation Administration during 2021, 4,290 of which related to the FTMM. Ex. 69.

54. 2021 "was the worst year on record for buffoonish behavior on planes." Ex. 70.

55. So far this year, FAA has received 814 reports of unruly passengers, 535 of which related to the FTMM. Ex. 71.

56. This conduct is understandable since the Food, Drug, & Cosmetic Act protects all Americans' right to refuse administration of an FDA unauthorized or EUA medical device such as a face covering, and masks make it difficult to breathe and function.

57. The FTMM worsens transportation safety as some people violently stand up for their right to breathe freely, and many flight crews have become increasingly hostile to any passenger who dares remove his/her mask for any reason.

58. "Despite coming with hefty fines and the threat of criminal prosecution, the [FTMM] has spawned an epidemic of shouting matches – and worse – between defiant passengers and flight crews. … But if airlines are the last place in America to require masks, the skies are likely to become even less friendly for flight crews." Ex. 70.

59. "[T]he level of in-flight fracas has gotten exponentially worse in the past two years, with most cases involving disputes over masking." *Id*.

60. Airplanes, airports, and other transportation conveyances and terminals are now among the last places in America where anyone is forced to block their breathing.

61. Chaos in the sky is likely to soon get worse. "Imagine the fury among anti-mask passengers if the federal government continues to enforce a mask requirement on airlines into the late spring and even the summer, when no one's making people mask up anywhere else. … Should

the mask mandate continue into the summer and beyond, airlines could expect the bad be-

havior to increase, as customers grow accustomed to going maskless everywhere else." *Id*.

62. There are numerous videos posted to YouTube of in-flight conflicts between flight crews and

passengers over the illegal mask mandates. A small sample of these videos is listed at Ex. 72.

63. "The current climate in the passenger cabin is highly stressed. We are experiencing a record

high number of aggressive passenger incidents, many of which are fueled by … refusal to

comply with onboard mask rules," the president of a major flight-attendant union said Dec.

24, 2021. Ex. 73.

64. All of the "unruly" behavior we've seen aboard airplanes when airlines try to enforce the

FTMM is explained by science, none of which the defendants considered: "Wearing masks,

thus, entails a feeling of deprivation of freedom and loss of autonomy and self-determination,

which can lead to suppressed anger and subconscious constant distraction, especially as the

wearing of masks is mostly dictated and ordered by others. These perceived interferences of

integrity, self-determination and autonomy, coupled with discomfort, often contribute to

substantial distraction and may ultimately be combined with the physiologically mask-related

decline in psychomotoric abilities, reduced responsiveness, and an overall impaired cognitive

performance." Ex. 45.

65. Being forced to cover the nose and mouth, a person's only two sources of oxygen – breathing

is of course essential to maintaining life – "leads to misjudging situations as well as delayed,

incorrect, and inappropriate behavior and a decline in the effectiveness of the mask wearer."

*Id.*

66. "The use of masks for several hours often causes further detectable adverse effects such as headaches, local acne, mask-associated skin irritation, itching, sensations of heat and damp-ness, impairments, and discomfort predominantly affecting the head and face. However, the head and face are significant for well-being due to their large representation in the sensitive cerebral cortex (homunculus)." *Id*.

67. "[P]assengers have verbally abused and taunted flight attendants trying to enforce airline mask requirements…" Ex. 14.

68. "A flight attendant reported being so busy seeking mask compliance that the employee couldn't safely reach a seat in time for landing. One airline captain, distracted by mask con-cerns, descended to the wrong altitude. The repeated talk of problem passengers in Row 12 led the captain to mistakenly head toward 12,000 feet, not a higher altitude given by air traffic control to keep planes safely apart." *Id.*

69. But passengers are allowed to drop their masks to eat and sip beverages, negating any possi-ble positive impact of forced masking. "When you start opening it up to eating, the whole thing kind of weakens." *Id.*

70. "Flight attendants are dealing with mask compliance issues on every single flight they work right now." *Id.*

71. "The Federal Aviation Administration is warning air travelers about what it describes as a dramatic increase in unruly or dangerous behavior aboard passenger airplanes." Ex. 74.

72. "It is no secret that the threats flight attendants face each day have dramatically increased," states a letter from Julie Hedrick, president of the Association of Professional Flight Attendants. "Every day, we are subjected to verbal and sometimes physical altercations, mainly centered around mask compliance." Ex. 75.

73. "Airlines and federal officials have noted an uptick in passenger misbehavior. Flight attendant union leaders have attributed much of the uptick in passengers refusing to wear masks …" *Id*.

74. "President Joe Biden made a federal face mask rule on planes one of his first executive orders after he took office. But passenger misbehavior has continued throughout the year despite numerous fines against passengers proposed by the FAA." *Id*.

75. May 28, 2021: "Incidents of unruly behavior from airplane passengers has risen to an unprecedented level this year, union leader Sara Nelson told CNBC on Friday, the start of the Memorial Day holiday weekend. 'This is an environment that we just haven't seen before, and we can't wait for it to be over,' the president of the Association of Flight Attendants-CWA said … She noted the role masks are playing in the surge…" Ex. 76.

76. Carrying out mask rules also worsens the already strained position of flight attendants, who are frontline enforcers even as they keep their usual safety responsibilities, experts say. "Flight attendants are dealing with mask compliance issues on every single flight they work right now," said Taylor Garland, spokeswoman for the Association of Flight Attendants-CWA, noting that those efforts range from friendly reminders to facing passengers "actively challenging the flight attendants' authority." *Id.*

77. "One in five flight attendants so far this year has been involved in physical altercations with unruly passengers and 85% of cabin crew members have dealt with disruptive passengers this year…" Ex. 77.

78. "[M]any flight attendants reported … being subjected to yelling and swearing for federal mask mandate directions." *Id*.

79. The FTMM has "proven problematic. Physical confrontations on airplanes have dramatically increased this year, and of the 3,000+ that have been recorded by the Federal Aviation Administration so far in 2021, nearly three-quarters of them have been a direct result of arguments over wearing a face mask – whether between crew members and passengers, or passengers vs. passengers." Ex. 78.

80. "My fear, however, is that the mandate is going to someday cause a far bigger problem while in the air than just some unruly passenger being eventually duct-taped to a seat. One of these days, a confrontation is going to escalate far further than the crew member who had a finger bitten or the flight attendant who caught an errant punch square in the face and had two teeth knocked out. Ask yourself, is it worth it to have a mandate that ostensibly is for your safety but only leads further to unsafe conditions?" *Id*.

81. The defendants' reckless continual enforcement of mask mandates has led to "a surge in aggressive and violent behavior at airports and on flights…" Ex. 79.

82. "The system for keeping the peace in America's skies is creaking under the pressure of what airlines and regulators say is an unprecedented proliferation of misbehavior. … As travel rebounds, that structure is being strained by hostility to mask mandates…" Ex. 80.

83. "Even if not intended to bring the plane down, you can imagine the kind of pandemonium on planes that we've seen in some of these videos that people have taken that can cause an incredibly dangerous accident," said U.S. Attorney General Merrick Garland." *Id*.

84. These incidents would vanish if this Court vacates the FTMM.

85. "The FAA has seen a disturbing increase in incidents where airline passengers have disrupted flights with threatening or violent behavior. These incidents have stemmed … from passengers' refusals to wear masks…" Ex. 81.

86. "The tense situation in the air this summer has led many attendants to say that they feel exhausted, afraid for their personal safety and, in some cases, concerned that the situation could turn dangerous." Due to the unlawful mask mandate, "encountering unruly passengers, once rare, is now almost expected." Ex. 82.

87. "Flight attendants across many airlines say the situation is wearing on their mental health and physical well-being," which is dangerous for aviation safety. *Id*.

88. Major airlines, including most of our employers, having been calling for the abolition of the FTMM for the past 10 months.

89. Frontier Airlines CEO Barry Biffle said June 23, 2021, that face coverings are a prime contributor to a string of recent in-flight disruptions: "The reality is, a lot of people don't want to wear masks," Biffle said. "You don't have to wear a mask here [at the convention], you don't have to wear [masks] at Walmart, but yet you've got to do it on a plane." Ex. 83.

90. Spirit Airlines CEO Ted Christie also said June 23, 2021, that the U.S. government can help reduce the incidence of unruly air passenger behavior by doing away with the requirement that travelers wear face coverings: "That's got to be the next step – when facial [covering

requirements] are relaxed on airplanes," Christie said. "That is going to take a lot of steam out of things." *Id*.

91. Southwest Airlines CEO Gary Kelly and Airlines for America, the trade group representing most major U.S. carriers, lobbied for the FTMM to terminate Sept. 13, 2021. Exs. 84-86.

92. With mask mandates "in place, there has been a rise in onboard incidents that have harmed flight attendants, delayed or cancelled flights … When this atmosphere is combined with tensions around mask policy, we have seen a summer with more onboard skirmishes and more people injured than ever before," wrote Ben Baldanza, former CEO of Spirit Airlines. Ex. 87.

93. "[T]he root cause of most of these incidents has been the mandated mask policy. It's not the policy itself, but the inconsistency of that policy with other parts of life. While many of us may be able to clearly understand why we must wear a mask on a plane but don't have to in restaurant, to others this makes no sense. Put that view in the stressful and emotional environment of an airline flight and the results we've seen this summer are not totally surprising." *Id*.

94. "[L]etting the [mask] mandate expire would lower the tensions onboard significantly and greatly reduce the number of potentially dangerous confrontations that flight attendants must face." *Id*.

**G. CDC and HHS ignore better options than imposing the FTMM.**

95. The defendants have not used more-effective options than the FTMM to reduce COVID-19 infections in the transportation sector.

96. For example, in June 2007, CDC and HHS developed a public-health Do Not Board ("DNB") list, enabling domestic and international health officials to request that individuals with communicable diseases be restricted from boarding commercial aircraft arriving into, departing from, or traveling within the United States.

97. CDC published a notice seven years ago concerning the "Criteria for Requesting Federal Travel Restrictions for Public Health Purposes, Including for Viral Hemorrhagic Fevers." 18 Fed. Reg. 16,400 (March 27, 2015); Ex. 18.

98. There also exists a complimentary Public Health Border Lookout Record ("Lookout") system for individuals with communicable diseases that pose a public-health threat to travelers to restrict them from boarding commercial aircraft arriving into, departing from, or traveling within the United States. *Id.*

99. Once an individual is placed on the DNB list, airlines are instructed not to issue a boarding pass to the individual for any commercial flight. Individuals included on the DNB list are assigned a Lookout record that assists in ensuring that an infected individual is detected if he or she attempts to enter or depart the United States through a port of entry. *Id.*

100.    "Disease is just a flight away. To protect America's health, CDC partners with the Department of Homeland Security to prevent the spread of serious contagious diseases during travel. CDC uses a Do Not Board list to prevent travelers from boarding commercial airplanes if they are known or suspected to have a contagious disease that poses a threat to the public's health. Sick travelers are also placed on a Lookout list so they will be detected if they attempt to enter the United States by land or sea. These tools can be used for anyone who poses a threat to the public's health." Ex. 19.

101.    But there is no evidence in the administrative record, media reports, or anywhere else

that the defendants are using the DNB list and Lookout system to stop people who have

tested positive for COVID-19 from traveling during the time they are a danger to spread the

virus to others (typically considered to be 10-14 days).

102.    The FTMM violates CDC's own guidance. CDC said March 3, 2022, "some 93% of the U.S.

population live in locations where COVID-19 levels are low enough that people do not need

to wear masks indoors. … The agency said on Thursday that 85.4% of counties now rank as

low or medium risk and 92.9% of the population lives in those counties." Ex. 20.


**H. CDC and HHS fail to take into account that airplane cabins pose little risk for coronavirus spread.**

103.    There's nothing in the administrative record showing that CDC and HHS considered the

ample evidence provided by the aviation industry and others that masks aren't necessary and

do nothing to reduce COVID-19 transmission.

104.    U.S. air carriers commissioned a lengthy report "Assessment of Risks of SARS-CoV-2 Trans-

mission During Air Travel & Non-Pharmaceutical Interventions to Reduce Risk" by the Harvard

T.H. Chan School of Public Health as part of the Aviation Public Health Initiative ("APHI"). Ex.

24.

105.    "Ventilation Systems on Aircraft: These sophisticated systems deliver high amounts of

clean air to the cabin that rapidly disperses exhaled air, with displacement in the downward

direction, reducing the risk of passenger-to-passenger spread of respiratory pathogens. Air-

craft ventilation offers enhanced protection for diluting and removing airborne contagions in

comparison to other indoor spaces with conventional mechanical ventilation and is substantially better than residential situations. This level of ventilation effectively counters the proximity travelers will be subject to during flights. The level of ventilation provided onboard aircraft would substantially reduce the opportunity for person-to-person transmission of infectious particles…" *Id.*

106.　　"Particular emphasis is placed on the effectiveness of aircraft ventilation systems, which are able to filter 99.97% of SARS-CoV-2 particles out of air found on aircraft." *Id.*

107.　　The study confirms what our employers have been promoting to customers: There is little-to-no risk of contracting COVID-19 aboard an aircraft. "After detailed analysis of these reports***, it is the view of APHI that there have been a very low number of infections that could be attributed to exposure on aircraft during travel***." *Id.* (emphasis added).

108.　　CDC itself admitted "***the risk of getting a contagious disease on an airplane is low.***" *Id.* (emphasis added).

109.　　"A significant finding from the evaluation of these evacuation flight procedures [from China early in the pandemic] was that there was no COVID-19 infection among any of the air medical crews, despite the exposure to numerous positive cases." *Id.*

110.　　"Given the volume of commercial flights daily, carrying millions of passengers and crew worldwide***, the number of documented incidents of infectious disease transmission occurring on board an aircraft remains infrequent***." *Id.* (emphasis added).

111.　　"Based on the investigations of outbreaks of other respiratory diseases on aircraft, it appears that transmission on aircraft is relatively infrequent." *Id.*

112.    "[T]he cabin air is recirculated and filtered through a high-efficiency particulate air filter, also known as a HEPA filter. All the airlines interviewed have aircraft that are equipped with HEPA filters, and one of the airlines has increased the replacement frequency of their HEPA filters." *Id.*

113.    "The HEPA filters remove, at a minimum, 99.97% of the particulate matter from the return air. This high level of filtration ensures that the air supplied to the cabin is virtually free of particulate matter, including bacteria and viruses." *Id.*

114.    "Aircraft meeting current ventilation standards with 50% recirculation HEPA-filtered air will supply passengers with a clean air delivery rate of 19 cfm/person, which is essentially free of any virus particles." *Id.*

115.     "[T]he risk of SARS-CoV-2 transmission onboard aircraft will be below that found in other routine activities during the pandemic, such as grocery shopping or eating out." *Id.*

116.    "[T]he aircraft's environmental control systems effectively diluting and removing pathogens significantly reduce the risk of passengers and crewmembers from acquiring COVID-19..." *Id.*

117.    Several top airline officials and the industry's largest trade association have spoken out against the FTMM since June 2021, saying it's unnecessary and hurts transportation security.

118.    Southwest and American's CEOs testified to a Senate committee Dec. 15, 2021, that masks do not reduce the spread of COVID-19 and airplane cabins are already safe because of their excellent air filtration and recirculation. Ex. 25.

119.   Airlines for America, the airline industry's largest trade group representing our employers American, JetBlue, and Southwest, joined in a Feb. 25, 2021, letter to the White House again urging repeal of the FTMM. Ex. 26.

120.   "By March 18, repeal the Federal mask mandate for public transportation or provide a clear roadmap to remove the mask mandate within 90 days. ... Airplanes are already equipped with advanced air filtration systems, and airports have made large investments in air filtration, sanitation, and layouts. COVID-19 hospitalization rates have decreased significantly and **the mask mandate should be lifted** to reflect the improved public health environment." *Id*. (emphasis added).

121.   "[M]any of these same policies also came with the **devastating** ... consequences of severely limiting and discouraging travel. ... Since the start of the pandemic, the federal government's advisories, policies, and public messaging have focused on discouraging or actively restricting domestic and international travel. It is time for high-level officials within the Administration to publicly encourage travel to and within the U.S. Doing so would send a clear message to U.S. businesses, trading partners, and travelers alike that America is once again open for business." *Id*. (emphasis added).

122.   "[W]e encourage the Administration to immediately remove travel requirements that no longer fit with the current environment and to set clear timelines and metrics for when others will be lifted," including the mask mandate. *Id*.

123.   The International Air Transport Association ("IATA") has called for the end to mask mandates  aboard airplanes worldwide. Travel restrictions such as the FTMM "have had such a

26

devastating impact on lives, economies, and the freedom to travel," said Willie Walsh, IATA's director general. Ex. 27; *see also* Ex. 28.

124.    "The past few weeks have seen a dramatic shift by many governments around the world to ease or remove COVID-19-related travel restrictions and requirements as the disease enters its endemic phase. It's vital that this process continue and even accelerate, to more quickly restore damaged global supply chains and enable people to resume their lives. ***One step to encourage a return to normality is to remove mask mandates for air travel. It makes no sense to continue to require masks on airplanes*** when they are no longer being required in shopping malls, theatres or offices. Aircraft are equipped with highly sophisticated hospital quality filtration systems and have much higher air flow and air exchange rates than most other indoor environments where mask mandates already have been removed." Ex. 27 (emphasis added)

**I. CDC and HHS fail to take into account the voluminous scientific and medical research showing masks are totally ineffective in reducing COVID-19 transmission.**

125.    The CDC official responsible for the FTMM admitted masks are worthless and are just for show: "[W]e mask because it's the way we take care and express our concern for each other," said Marty Cetron, director of CDC's Division of Global Migration & Quarantine. Ex. 29.

126.    There's nothing in the administrative record showing that CDC and HHS considered the robust scientific and medical evidence documenting how masks are totally ineffective in reducing COVID-19 infections, hospitalizations, and deaths. *See* https://bit.ly/ masksarebad for 228 scientific studies, medical articles, and videos detailing how masks do not reduce virus transmission but hurt human health. A sampling of these studies are quoted below.

127.   For example, a study released May 25, 2021, by the University of Louisville found state mask mandates didn't help slow COVID-19 transmission. Ex. 30.

128.   Mask manufacturers themselves admit their products are "not for medical use," "cannot eliminate the risk of contracting an infectious disease," "are not personal protective equipment," and "are not intended … to prevent any disease or illness." Exs. 31-32 (photographs of various masks for sale).

129.   The federal government's experience confirms masks aren't effective, data that CDC and HHS failed to consider. TSA admits that, as of March 13, 2022, 22,297 of its employees[3] – all of whom must wear masks – have tested positive for COVID-19. Ex. 33.

130.   CDC and HHS fail to answer a simple question: "If masks are effective, why have so many TSA workers contracted COVID-19?"

131.   Wearing a cloth mask does not shield the user from coronavirus because too many infected droplets can slip through, according to a study by scientists at New Mexico State University. Ex. 34.

132.   Masks can't be worn while transportation passengers are eating and drinking, thereby eliminating any effectiveness they might have in reducing virus transmission from infected travelers.

---

[3] Since about half of those infected with COVID-19 don't have symptoms and might not realize they are infected, health authorities indicate that the real prevalence of the virus is typically at least double the number of cases confirmed by testing. TSA admits 22,297 of its workers have tested positive for coronavirus (34% of its employees). Ex. 33. This means that some 44,594 TSA workers, an astounding two-thirds of its workforce of 65,000, have likely had coronavirus. Yet they all have been forced to wear masks for more than 1½ years. So how exactly are masks effective in stopping COVID-19?

133.    One of the first real-world studies to conclude that face masks don't reduce COVID-19 infections was published in November 2020 by Danish scientists. The study divided thousands of Danish into groups of maskwearers and nonmaskwearers. "4,862 completed the study. Infection with SARS-CoV-2 occurred in 42 participants [wearing] masks (1.8%) and 53 control participants [who did not cover their faces] (2.1%). The between-group difference was 0.3 percentage point … ***the difference observed was not statistically significant***…" Ex. 35 (emphasis added).

134.    "When it comes to masks, it appears there is still little good evidence they prevent the spread of airborne diseases. … overall, ***there is a troubling lack of robust evidence on face masks and Covid-19***." Ex. 36 (emphasis added).

135.    "[N]ow that we have properly rigorous scientific research we can rely on, ***the evidence shows that wearing masks in the community does not significantly reduce the rates of infection***." *Id.* (emphasis added).

136.    "Upon our critical review of the available literature, we found only weak evidence for wearing a face mask as an efficient hygienic tool to prevent the spread of a viral infection," according to a study published in the European Journal of Medical Research. Ex. 37.

137.    "In controlled laboratory situations, face masks appear to do a good job of reducing the spread of coronavirus (at least in hamsters) and other respiratory viruses. However, evidence shows maskwearing policies seem to have had much less impact on the community spread of COVID-19. Why this gap between the effectiveness in the lab and the effectiveness seen in the community? The real world is more complex than a controlled laboratory situation." Ex. 38.

138.   "The most comprehensive between-country study of masks for COVID-19 infection is a comparison of policy changes, such as social distancing, travel restrictions, and mask wearing, across 41 countries. ***It found introducing a mask-wearing policy had little impact*** …" *Id.* (emphasis added).

139.   "CDC has admitted face masks do little to prevent the spread of COVID-19 amid mounting pressure to lift mask mandates across the U.S. In a new study, the CDC found face masks had a negligible impact on coronavirus numbers that didn't exceed statistical margins of error." Ex. 39.

140.   "***Where others say the science is settled, our analysis shows that is not the case***. We break down the most widely referenced studies on masking policies so you can see for yourself what the data really says. We should also point out that ***it is unscientific to claim that the science is settled***. Science is always a work-in-progress and we should never make the false claim that a scientific theory is settled as fact." Ex. 40. (emphasis added).

141.   "COVID-19 is as politically-charged as it is infectious. Early in the COVID-19 pandemic, the WHO, the CDC, and NIH's Dr. Anthony Fauci discouraged wearing masks as not useful for non-health care workers. Now they recommend wearing cloth face coverings in public settings where other social distancing measures are hard to do (e.g., grocery stores and pharmacies). ***The recommendation was published without a single scientific paper or other information provided to support that cloth masks actually provide any respiratory protection***," according to the Association of American Physicians & Surgeons. Ex. 41. (emphasis added).

142.   "Conclusion: ***Wearing masks (other than N95) will not be effective at preventing SARS-CoV-2 transmission***, whether worn as source control or as PPE." *Id.* (emphasis added).

143.    CDC constantly ignores its own research: "In a recent report in Emerging Infectious Diseases, … CDC suggests what experts have stated all along: There is no conclusive evidence that cloth masks protects users from coronavirus, especially since most people do not use them correctly and do not keep them clean." Ex. 42.

144.    "There is increasing evidence that cloth masks not only may be ineffective against stopping coronavirus transmission, but that **they may actually increase the spread of the virus, as well as worsening other health conditions**." *Id*. (emphasis added).

145.    "A September report by the CDC found that more than 70% of COVID-positive patients contracted the virus in spite of faithful mask wearing while in public. Moreover, 14% of the patients who said they 'often' wore masks were also infected. Meanwhile, just 4% of the COVID-positive patients said they 'never' wore masks in the 14 days before the onset of their illness." *Id.*

146.    "A Covid-19 cross-country study by the University of East Anglia came to the conclusion that a mask requirement was of no benefit and could even **increase the risk of infection**." Ex. 43.

147.    "A July 2020 study by Japanese researchers found that **cloth masks 'offer zero protection against coronavirus'** due to their large pore size and generally poor fit." *Id.* (emphasis added).

148.    "Importantly, **the evidence just is and was not there to support mask use for asymptomatic people to stop viral spread during a pandemic**. While the evidence may seem conflicted, the evidence (including the peer-reviewed evidence) actually does not support its use and **leans heavily toward masks having no significant impact in stopping spread of the COVID virus**. In fact, it is not unreasonable at this time to conclude that surgical and cloth

masks, used as they currently are, have absolutely no impact on controlling the transmission of Covid-19 virus, and ***current evidence implies that face masks can be actually harmful***." Ex. 44 (emphasis added).

149.    CDC and HHS "have failed to look at the evidence or follow it, and ***continue to operate in an arbitrary nonscientific, nonevidence informed manner***." *Id.* (emphasis added).

150.    "The history of modern times shows that already in the influenza pandemics of 1918-1919, 1957-58, 1968, 2002, in SARS 2004–2005, as well as with the influenza in 2009, ***masks in everyday use could not achieve the hoped-for success in the fight against viral infection scenarios***." Ex. 45 (emphasis added).

151.    CDC admitted in its "Emerging Infectious Diseases" May 2020 publication that "Although mechanistic studies support the potential effect of hand hygiene or face masks, evidence from 14 randomized controlled trials of these measures did not support a substantial effect on transmission of laboratory-confirmed influenza. … The effect of hand hygiene combined with face masks on laboratory-confirmed influenza was not statistically significant …" Ex. 46.

152.    The University of Colorado School of Medicine published an article in the January/February  2021 edition of Annals of Family Medicine concluding: "Cloth masks lack evidence for adequate protection of health care clinicians against respiratory viral infections. The CDC notes that cloth masks are not considered [personal protective equipment] and that their capability to protect health care clinicians is not currently known. The CDC does not offer information regarding the degree of protection a cloth mask might provide compared to a medical mask." Ex. 47.

153.    "Transmission of COVID-19 in 282 clusters in Catalonia, Spain: a Cohort Study," published Feb. 2, 2021, in Lancet Infectious Diseases, "**observed no association of risk of transmission with reported mask usage by contacts**…" Ex. 48 (emphasis added).

154.    "At the very end of 2020, the WHO updated their guidelines, noting that any kind of mask was ineffective if the wearer comes into close contact with someone for 15 minutes or more. … A mask alone, even when it is used correctly, is insufficient to provide adequate protection or source control." Ex. 49.

155.    "The World Health Organization admits there is no scientific medical reason for any healthy person to wear a mask outside of a hospital. … If you do not have any respiratory symptoms, such as fever, cough, or runny nose, you do not need to wear a medical mask. When used alone, masks can give you a false feeling of protection and can even be a source of infection when not used correctly." Ex. 50.

156.    The U.S. Department of Labor's Occupational Health & Safety Administration ("OSHA") states "Surgical masks are not considered respirators by OSHA … surgical masks do not seal tightly to the wearer's face, nor do they provide a reliable level of protection from inhaling smaller airborne particles." Ex. 51.

157.    New studies and articles come out every week showing that masks don't reduce COVID-19 spread but harm human health. For a few recent examples, *see* Exs. 52-55.

**J. CDC and HHS fail to consider that masks pose serious health risks to humans forced to wear them.**

158.    In addition to the science showing that masks have proven totally ineffective in reducing coronavirus spread and deaths, there's nothing in the administrative record showing that CDC

and HHS considered the serious health risks to human beings of forced masking nor the dangers of oxygen deprivation at high altitude such as in airplane cabins.

159.    Hundreds of scientific and medical studies illustrate the frightening number of negative health consequences of covering your face. https://bit.ly/ masksarebad.

160.    A table succinctly summarizes the numerous "Physiological & Psychological Effects of Wearing Facemasks & Their Potential Health Consequences." Ex. 56.

161.    "It is not clear however, what the scientific and clinical basis for wearing facemasks as protective strategy, given the fact that facemasks restrict breathing, causing hypoxemia and hypercapnia, and increase the risk for respiratory complications, self-contamination, and exacerbation of existing chronic conditions," according to a paper published by the National Institutes of Health ("NIH"), a part of HHS. Ex. 57.

162.    The leading authority on this subject is a 42-page paper published April 20, 2021, by eight German doctors and scientists in the International Journal of Environmental Research & Public Health. Ex. 45.

163.    They found: "Up until now, there has been no comprehensive investigation as to the adverse health effects masks can cause." The doctors reviewed 65 scientific papers on masks – and determined dozens of adverse health effects of covering your nose and mouth. *Id*.

164.    These German doctors and scientists coined a new disease: Mask-Induced Exhaustion Syndrome ("MIES"). *Id.*

165.    Symptoms of MIES include "an increase in breathing dead space volume, increase in breathing resistance, increase in blood carbon dioxide, decrease in blood oxygen saturation,

increase in heart rate, increase in blood pressure, decrease in cardiopulmonary capacity, in-
crease in respiratory rate, shortness of breath and difficulty breathing, headache, dizziness,
feeling hot and clammy, decreased ability to concentrate, decreased ability to think, drowsi-
ness, decrease in empathy perception, impaired skin barrier function with itching, acne, skin
lesions and irritation, overall perceived fatigue and exhaustion." *Id.*

166.   Scientists have identified at least 68 dangers to human health from maskwearing includ-
ing adverse skin reactions such as acne, alveolitis (an inflammatory lung disorder), anxiety,
asthma, bacterial pneumonia, blood-oxygen depletion, breathing difficulties, bronchiectasis
(a condition in which the lungs' airways become damaged), carbon-dioxide retention, candid-
iasis (fungal infestation of the mucous membranes), cheilitis (inflammation of the lips),
chronic bronchitis, chronic pneumonia, confusion, concentration problems, decrease in psy-
chomotoric abilities, decreased thinking ability and disorientation, depression, dental im-
pacts such as cavities, discouragement, disrupted nonverbal and verbal communication, dis-
rupted social interaction, disruption of the basics of human communication (verbal and non-
verbal), dizziness, drowsiness, dry mouth, elevated risk of COVID-19 through self-contamina-
tion, elevated transcutaneous carbon-dioxide values, exhaustion, facial deformities, facial
itching, facial rashes, fatigue, fibrosis (excess tissue deposition), gingivitis (inflammation of
the gums), halitosis (bad breath), headaches, hypercapnia hyperventilation, hypoxia, im-
paired clarity of speech, impaired cognitive abilities, impaired field of vision, impaired learn-
ing, impetigo (a bacterial infection that produces red sores and can lead to kidney damage),
increased blood pressure, increased feelings of insecurity, increased heart rate, increased risk
of infection because masks are an ideal growth and breeding ground for various pathogens

such as bacteria and fungi, increased stress, inhalation of toxic substances such as microplastics and chlorine compounds located in the masks, irritability, irritation of the respiratory tract, isolation, malaise, microbiological contamination (germ colonization), neuropathological and cardiovascular consequences, numbness, panic attacks, physiological changes and discomfort, reduced cardiopulmonary capacity, reduced happiness, reduced performance capability, skin irritation, social withdrawal, spontaneous pneumothorax, vascular damage, and voice disorders. https://bit.ly/masksarebad.

167.    Numerous other medical and scientific studies warn us of the dangers of wearing face masks: "A recent study in the journal Cancer Discovery found that inhalation of harmful microbes can contribute to advanced stage lung cancer in adults*. Long-term use of face masks may help breed these dangerous pathogens*. Microbiologists agree that frequent mask wearing creates a moist environment in which microbes are allowed to grow and proliferate before entering the lungs." Ex. 58 (emphasis added).

168.    "Since forced mask wearing began, dermatologists have coined the term 'maskne' to describe an onset of pimples near the mouth caused by masks clogging up pores with oil and bacteria. This can be caused by either disposable or cloth masks." *Id.*

169.    "Dentists have also been warning about a phenomenon known as 'mask mouth' in which patients are arriving back to the dental office with an increase in gingivitis and tooth decay as high as 50% in a period of just a few months since mask mandates began. ***This discovery sheds light on the growing evidence of harm caused by long-term mask wearing***." *Id.* (emphasis added).

170.    "In some situations, wearing a cloth face covering may exacerbate a physical or mental health condition, lead to a medical emergency, or introduce significant safety concerns, [CDC] explains." Ex. 59.

171.    "Breathing is one of the most important physiological functions to sustain life and health. Human body requires a continuous and adequate oxygen (O2) supply to all organs and cells for normal function and survival. … Long-term practice of wearing facemasks has **strong potential for devastating health consequences**." Ex. 57.

172.    "Vulnerable populations such as people with mental health disorders … are at significant health risk for complications and harm … Wearing [a] facemask mechanically restricts breathing by increasing the resistance of air movement during both inhalation and exhalation process. … **prolonged and continuous effect of wearing facemask is maladaptive and could be detrimental for health**." *Id.* (emphasis added).

173.    "**Cloth masks actually risk your health rather than protect it**. The moisture caught in these masks will become mildew-ridden in 30 minutes. Dry coughing, enhanced allergies, sore throat are all symptoms of a micro-mold in your mask." Ex. 49 (emphasis added).

174.    "Scores of dermatologists, dentists, immunologists, virologists, [and] pediatricians all over the world have been sounding the alarm for months over the continued use of face masks." *Id.* (emphasis added).

175.    "But aside from not being as effective against the coronavirus as so-called health experts claim, masks may even pose a risk to human health. For instance, a recently published review of studies on mask-related adverse health effects suggested that **mask-wearing may seriously harm people without any notable benefit**." Ex. 60 (emphasis added).

176.    "Scientists have found evidence that some face masks which are on sale and being used by members of the general public are laced with toxic chemicals. Preliminary tests have revealed traces of a variety of compounds which are heavily restricted for both health and environmental reasons. This includes formaldehyde, a chemical known to cause watery eyes; a burning sensations in the eyes, nose, and throat; coughing; wheezing; and nausea. Experts are concerned that the presence of these chemicals in masks which are being worn for prolonged periods of time could cause unintended health issues." Ex. 61.

177.    "Carbon dioxide ($CO_2$) is a colorless, odorless, non-flammable gas that naturally occurs in the atmosphere. $CO_2$ is produced by body metabolism and is a normal component of exhaled breath. … $CO_2$ is denser than air and can collect in high concentrations in … confined spaces [such as within face masks] where it can displace oxygen creating a serious health hazard." Ex. 62.

178.    "The primary health effects caused by $CO_2$ are the result of its behavior as a simple asphyxiant. A simple asphyxiant is a gas which reduces or displaces the normal oxygen in breathing air. Symptoms of mild $CO_2$ exposure may include headache and drowsiness. At higher levels, rapid breathing, confusion, increased cardiac output, elevated blood pressure and increased arrhythmias may occur." *Id*.

179.    Airplanes contain lower oxygen levels than most passengers who live at sea level are used to. Most airplanes are pressurized to an elevation of 8,000 feet. As most people know, oxygen levels decrease with altitude. "For people with conditions – like heart or lung disease – that cause them to have special oxygen requirements, this is a big deal, and means they might

need to fly with an oxygen concentrator, or not fly at all. But even for healthy people who are used to the abundant levels of oxygen present at sea level, it can have an effect." Ex. 63.

**K. The FTMM recklessly endangers transportation workers by failing to comply with Occupational Safety & Health Administration rules for face coverings.**

180.    OSHA sets standards for respiratory protection. None of our employers are following these legal requirements as the FTMM does not mention them. Exs. 64-65.

181.    Due to the dangers of obstructing a person's breathing, OSHA requires that a Respirator Medical Evaluation Questionnaire be completed by anyone who will be required to wear a mask. Ex. 66.

182.    None of us have ever been asked to complete a Respirator Medical Evaluation Questionnaire by our employers since the FTMM took effect.

183.    If any company demands someone wear a mask, OSHA requires it "Must provide respirators, training, and medical evaluations at no cost..." Ex. 67.

184.    In enforcing the FTMM, none of our employers have provided training or medical evaluations.

185.    "All oxygen-deficient atmospheres (less than 19.5% O2 by volume) [such as airplane cabins] shall be considered IDLH," according to OSHA. IDLH stands for "immediately dangerous to life or health." *Id*.

186.    "The percentage oxygen on a plane traveling around [8,000 feet] is equivalent to 15.1% oxygen at sea level. … in people with existing respiratory difficulties, there is a risk of hypoxia." Ex. 68.

187.    You can't wear masks in this atmosphere because it can cause serious injury or death. This is likely why our employers are having customers who become violent or try to open the emergency exits at 35,000-plus feet. These people are experiencing hypoxemia due to oxygen deprivation from having their nose and mouth covered.

188.    OSHA requires that before any human be required to don a mask, a company must: 1) provide a medical evaluation to determine person's ability to use a respirator, before fit testing and use; 2) identify a physician or other licensed health care professional to perform medical evaluations using a medical questionnaire or an initial medical examination that obtains the same information as the medical questionnaire; and 3) obtain a written recommendation regarding the employee's ability to use the medical device. Ex. 67.

189.    None of our employers have complied with these rules in forcing us to wear masks because of the FTMM.

190.    OSHA requires companies mandating masks to "provide effective training to respirator users, including: why the respirator is necessary and how improper fit, use, or maintenance can compromise the protective effect of the respirator; limitations and capabilities of the respirator; use in emergency situations; how to inspect, put on and remove, use and check the seals; procedures for maintenance and storage; recognition of medical signs and symptoms that may limit or prevent effective use; and general requirements of this standard." *Id*.

191.    None of our employers have provided the required training.


**L. The FTMM violates the Food, Drug, & Cosmetic Act by forcing travelers and workers to wear Food & Drug Administration unauthorized or Emergency Use Authorization medical devices without our consent.**

192.   CDC itself admits a mask does "NOT provide the wearer with a reliable level of protection from inhaling smaller airborne particles and is not considered respiratory protection." Ex. 88.

193.   Mask manufacturers concede their products are ineffective in preventing COVID-19 infection: "It is also important to ensure the product does not have any additional antimicrobial or anti-viral claims made within its labelling." Ex. 89.

194.   FDA, an agency within HHS, regulates most face masks under EUAs. Ex. 90.

195.   HHS and FDA state: "On April 18, 2020, in response to concerns relating to insufficient supply and availability of face masks, [FDA] issued an [EUA] authorizing the use of face masks for use by members of the general public… A face mask is a device … that covers the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels. It includes cloth face coverings as a subset. … Face masks are regulated by FDA when they meet the definition of a 'device' under section 201(h) of the Act. Generally, face masks fall within this definition when they are intended for a medical purpose. … Face masks are authorized under this EUA when they are intended for use as source control, by members of the general public … to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of SARS-CoV-2 during the COVID-19 pandemic." Ex. 91.

196.   "Face masks are not personal protective equipment." Ex. 92.

197.   The HHS secretary authorized EUAs for COVID-19 countermeasures (85 Fed. Reg. 17,335; Ex. 93) including respiratory devices (85 Fed. Reg. 13,907; Ex. 94).

198.   FDA published an EUA for face masks July 14, 2020. 85 Fed. Reg. 42,410; Ex. 95.

199.   Another mask EUA was published Nov. 20, 2020. 85 Fed. Reg. 74,352; Ex. 96.

200.   FDA states face masks must not be "labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction… No printed matter, including advertising or promotional materials, relating to the use of the authorized face mask *may represent or suggest that such product is safe or effective for the prevention or treatment of patients during the COVID-19 pandemic*." Ex. 91 (emphasis added).

201.   The instruction manual for a 3M N95 respirator mask, which is FDA approved, makes clear its wearing still has risks: "Misuse may result in sickness or death. … [It] cannot eliminate the risk of contracting infection, illness, or disease… Individuals with a compromised respiratory system, such as asthma or emphysema, should consult a physician and must complete a medical evaluation prior to use." Ex. 97.

202.   Despite the lack of data that masks are effective, FDA issued an umbrella EUA for 41 types of surgical masks, many of which are used by passengers to comply with the FTMM and the Airline Defendants' mask policies. Ex. 98.

203.   Notably five types of masks have been withdrawn from the EUA after FDA found them to be defective. *Id*.

204.   FDA has also revoked the EUA for respirator masks made in China for being faulty. Ex. 99.

205.   CDC's National Institute for Occupational Safety & Health ("NIOSH") found many masks made in China "authorized under the April 3, 2020, EUA did not meet the expected performance standards." *Id*.

206.    An astounding 167 respirator mask brands from China had their EUAs revoked by FDA. Another 54 were previously revoked. *Id*.

207.    FDA revokes EUAs when "appropriate to protect the public health or safety." Ex. 100.

208.    Surgical masks (typically light blue in color) made in China are also not authorized by FDA.

209.    Although these 221 respirator mask brands (plus all surgical masks) manufactured in China may no longer be legally sold in the United States, there are likely tens or even hundreds of millions of these face coverings still being used by passengers and transportation workers due to the FTMM.

210.    So not only are quality masks worthless in CDC's goal of reducing transmission of COVID-19 (https://bit.ly/masksarebad), but the vast majority sold in the United States are actually **defective**, according to FDA. Ex. 101.

211.    "The 'may be effective' standard for EUAs provides for a lower level of evidence than the 'effectiveness' standard that FDA uses for product approvals." Ex. 100.

212.     Even a well-informed consumer would find it nearly impossible to understand what types and brands of face masks have been authorized and which – if any – are regarded as safe to use by NIOSH to comply with the FTMM.

213.    The defendants' administrative record shows no indication these issues were considered.

214.    When a mask manufacturer applies for an EUA, it must agree it may not "misrepresent the product or create an undue risk in light of the public health emergency. For example, the labeling must not include any express or implied claims for: … antimicrobial or antiviral protection or related uses, (3) infection prevention, infection reduction, or related uses, or (4) viral filtration efficiency." Ex. 102.

215.    "All COVID-19 masks … are authorized, not approved or licensed, by the federal govern-

ment; they are Emergency Use Authorization (EUA) only. They merely 'may be effective.' …

EUA products are by definition experimental and thus require the right to refuse. Under the

Nuremberg Code, the foundation of ethical medicine, no one may be coerced to participate

in a medical experiment. Consent of the individual is 'absolutely essential.' A federal court

held that even the U.S. military could not mandate EUA vaccines to soldiers." Ex. 103.

216.    "[M]asks are authorized for use by the general public as 'investigational products' under

an Emergency Use Authorization ('EUA'). They are not an approved product, and are referred

to in the law as 'unapproved products' because they have not been fully tested and approved

for use by the FDA. Under the federal law that allows the FDA to issue EUAs (21 U.S.C. §

360bbb-3), you cannot be forced to wear a mask. The law provides that recipients of a prod-

uct authorized for use under and EUA can refuse to take the product." Ex. 104.

217.    "[T]he recipient of the product (the mask) must be informed of the option to refuse ad-

ministration of the product." *Id*.

218.    The defendants do not inform passengers and workers of our legal right to refuse admin-

istration of the medical device.

219.    "[B]y the FDA's own admission, face masks such as those in common use by the public are

not intended to protect the wearer or others from the COVID-19 virus, as they do not prevent

or reduce infection." Ex. 105.

220.    EUA medical devices are experimental in nature. There's "long settled legal precedent

which establishes that it is not legal to coerce an individual to accept an experimental prod-

uct. It further provides the historical background and evidence that Congress' intent in enacting Section 564 [of the FDCA] was to provide only one limited exception to the option to accept or refuse EUA products – that exception applies only to military personnel and only when national security is at risk. Federal agencies have also historically interpreted Section 564 as a prohibition on mandates of EUA products…" Ex. 106.

221.   "To be licensed, the FDA must find that a medical product is 'safe for use and … effective in use.' Until licensed, a medical product remains investigational, even after issuance of an EUA. … Long settled legal precedent establishes that it is not legal to coerce an individual to accept an unlicensed, and hence experimental, medical product. An individual must voluntarily agree, free from any undue influence, to accept same." Ex. 107.

222.   "Lay people and manufacturers of just about every type of business are lending assistance to create masks. Companies that once made mattresses, shoes, apparel and many other products are now turning efforts toward the manufacturing of face masks. Even a business that manufactures sports jerseys for professional athletes is now making masks using the same jersey material from its products." Ex. 108.

223.   None of these pop-up mask manufactures have FDA certification that their medical devices are safe to place on human faces.

224.   "The FDA is waiving regulatory requirements, including submission of premarket notification under the 510(k) process, registration and listing requirements, quality system regulation requirements, reports or corrections and removals, and unique device identification requirements. … the labeling should not include that the mask can be used for antimicrobial or antiviral protection or be used for infection prevention." *Id*.

225.    "FDA notes that because it cannot confirm the authenticity of any alternative respirators from abroad, it recommends that people take appropriate steps to verify the authenticity of the products before importing them. … FDA is now welcoming the opportunity to work with any manufacturer with interest in manufacturing masks and respirators – even if the manu-facturer has no previous experience in medical device manufacturing." *Id.*

226.    "Counterfeit medical devices have been a danger in the U.S. supply chain for years, but their presence has been especially of concern during the current pandemic, when there have been shortages of products considered to be medical devices by the FDA, such as medical masks…" Ex. 109.

227.    Additional details about the FDA unauthorized or EUA nature of most masks used by air-line passengers and employees against our will is available at Exs. 110-112.

228.    "Simply put: manufacturers producing even simple cloth face coverings are now produc-ing medical devices regulated by FDA and must therefore comply with certain regulatory re-quirements." Ex. 113.


**M. All 50 states do not require masking. The federal government may not impede on the states' sovereign police power to protect public health.**

229.    CDC's FTMM order overrides the mask policies of all 50 states (and the District of Colum-bia) that don't require masks. Ex. 114.

230.    Ten states never adopted a statewide mask mandate. The 40 states – seeing that manda-tory masking had no effect on their COVID-19 cases, hospitalizations, and fatalities – have repealed their face-covering dictates. *Id.*

231.    There are at least 14 states that prohibit mask mandates. *Id.*

232.    President Biden acknowledged Dec. 27, 2021, during a meeting of state governors that "Look, there is no federal solution" to COVID-19. "This gets solved at a state level." Exs. 115-116.

233.    However, the president has not repealed Executive Order 13998 that ordered CDC and HHS to mandate masks in the transportation sector. His administration continues extending TSA's enforcement of the FTMM without providing any explanation for doing so.

**N. Even if CDC voluntarily repeals its FTMM order, it could be reinstated at any time.**

234.    It's possible CDC could repeal the FTMM before the Court is able to render a judgment on this Complaint. However, that would in no way moot our case.

235.    CDC Director Rochelle Walensky, in announcing revised mask guidance Feb. 25, 2022, clearly stated the agency could change its masking recommendations again at any time.

236.    "None of us know what the future may hold for us and for this virus and we need to be prepared and we need to be ready for whatever comes next. We wanna give people a break from things like mask wearing when our levels are low and then have the ability to reach for them again, should things get worse in the future," Walensky told reporters during a Feb. 25, 2022, media briefing releasing new guidelines that most Americans should not wear masks. Ex. 117.

237.    Likewise Dr. Greta Massetti, a senior epidemiologist at CDC, said the agency will always be updating its mask guidelines, indicating that the FTMM (if ever repealed) could be reinstated at any time.

238.    "Public-health prevention strategies can be dialed up when our communities are experi-

encing more severe disease and dialed down when things are more stable," Massetti told

reporters during the Feb. 25 briefing. *Id*.

## V. CAUSES OF ACTION

**Count 1: Violation of the Administrative Procedure Act: The FTMM exceeds CDC and HHS' statutory authority under the Public Health Service Act.**

239.    The FTMM exceeds Defendants CDC and HHS' authority under § 361 of the Public Health

Service Act. 42 USC § 264.

240.    CDC and HHS are authorized to make and enforce "***regulations*** … to prevent the intro-

duction, transmission, or spread of communicable diseases from foreign countries into the

States or possessions, or from one State or possession into any other State or possession."

42 USC § 264(a) (emphasis added).

241.    The FTMM is an ***order*** issued by CDC, not a ***regulation*** duly promulgated into the Code of

Federal Regulations.

242.    "For purposes of carrying out and enforcing such ***regulations***, [CDC and HHS] may pro-

vide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction

of animals or articles found to be so infected or contaminated as to be sources of dangerous

infection to human beings…" *Id* (emphasis added).

243.    The FTMM is not a regulation published in the CFR. It also is not an enumerated measure

of "inspection, fumigation, disinfection, sanitation, pest extermination, destruction of ani-

mals or articles." *Id*.

244.    "Sanitation" refers to the proper disposal of human waste (urine and feces) as well as garbage. Masking is not a "sanitation" measure as the government argues. Nobody has ever said, for example, "I'm going to sanitize my face by covering it with a mask."

245.    Under the "major questions" doctrine, Section 361 does not authorize CDC and HHS to require masking throughout the nation's entire transportation system because that is a decision of such economic and political significance only Congress may specifically authorize it.

246.    A court must "hold unlawful and set aside agency action … found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 USC § 706(2)(C).

247.    The Court should hold unlawful and set aside the FTMM because CDC acted in excess of its statutory authority. *Id*.

**Count 2: Violation of the Administrative Procedure Act: Failure to observe the notice-and-comment procedure required by law before ordering the FTMM.**

248.    The FTMM is an "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 USC § 704. It represents the consummation of CDC and HHS' decisionmaking process with respect to requiring masks in the entire U.S. transportation sector. And it affects our legal rights and obligations because the mask mandate causes detrimental health effects to those of us who work in safety-critical jobs in the aviation sector. It also distracts from our important duties by forcing us to become the "mask police," mandating that passengers obstruct their breathing as a condition of transport.

249.    The APA requires agencies to issue rules through a notice-and-comment process. 5 USC § 553.

250.    The FTMM is a rule within the meaning of the APA because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or pre-scribe law or policy." 5 USC § 551(4).

251.    CDC issued the FTMM without engaging in the notice-and-comment process.

252.    Good cause does not excuse CDC's failure to comply with the notice-and-comment pro-cess because the agency had 10½ months to give notice, solicit comments, respond to those comments, and publish a regulation in the Code of Federal Regulations from the date the World Health Organization declared COVID-19 a global pandemic (March 11, 2020) until the date the FTMM took effect (Feb. 1, 2021). 5 USC § 553(b)(3)(B).

253.    Had CDC and HHS put the FTMM through the required APA notice-and-comment period, we would have submitted the concerns stated in our declarations. Exs. 1-10. We would have also commented that: 1) data shows states without mask mandates suffered fewer deaths per capita than states that imposed such requirements; 2) the FTMM is out of step with the current policies of every state that don't require masking; 3) requiring masks in the transpor-tation sector leads to widespread chaos in the skies and on the ground, endangering aviation and transit safety; 4) the FTMM unlawfully discriminates against travelers who can't wear a face covering due to a disability; 5) the gargantuan amount of scientific and medical evidence showing that masks have proven to be totally ineffective in reducing COVID-19 spread and deaths (*see* 228 scientific studies, medical articles, and videos at https://bit.ly/masksarebad); 6) scientists have known for a long time that masks aren't effective in reducing transmission of respiratory viruses (*Id*.); 7) masks pose serious health risks to humans forced to wear them (*Id*.); 8) many experts consider forcing kids to wear masks child abuse (*Id*.); 9) airplane cabins

pose little risk for coronavirus spread and there have been few, if any, reports of coronavirus transmission on aircraft.; and 10) the FTMM directly conflicts with other regulations that govern us as pilots.

254.    A court must "hold unlawful and set aside agency action … found to be … without observance of procedure required by law." 5 USC § 706(2)(D).

255.    The Court should hold unlawful and set aside the FTMM because it violates the APA's notice-and-comment requirement. *Id*.

**Count 3: Violation of the Administrative Procedure Act: Arbitrary and capricious agency action in ordering the FTMM.**

256.    The administrative record shows that CDC and HHS failed to take into account that the mask mandate impairs pilots' health, imperiling aviation safety. ¶¶ 27-52.

257.    The administrative record shows that CDC and HHS ignored that mask mandates have created chaos in the sky, recklessly endangering aviation safety and security. ¶¶ 53-94.

258.    The administrative record shows that CDC and HHS ignored better options than imposing the FTMM such as requiring COVID-19 test providers to report all positive results to the agency so those infected could be placed on the "Do Not Board" and "Lookout" lists, prohibiting them from flying for about two weeks while they capable of transmitting the virus to others. ¶¶ 95-102.

259.    The administrative record shows that CDC and HHS failed to take into account that airplane cabins pose little risk for coronavirus spread. ¶¶ 102-123.

260.    The administrative record shows that CDC and HHS failed to take into account the volu-

minous scientific and medical research showing masks have proven to be totally ineffective

in reducing COVID-19 spread and deaths. ¶¶ 125-157.

261.    The administrative record shows that CDC and HHS failed to consider that masks pose

serious health risks to humans forced to wear them. ¶¶ 158-179.

262.    The administrative record shows that CDC and HHS failed to consider that the FTMM reck-

lessly endangers transportation workers by failing to comply with Occupational Safety &

Health Administration rules for face coverings. ¶¶ 180-191.

263.    The Court should hold unlawful and set aside the FTMM because it is arbitrary, capricious,

and an abuse of discretion. 5 USC § 706(2)(A).

**Count 4: Violation of the Congressional Review Act: CDC and HHS did not submit the FTMM to Congress and the comptroller general before it took effect.**

264.    The Congressional Review Act ("CRA") "requires federal agencies to submit a report on

each new rule to both Houses of Congress and to the Comptroller General for review before

a rule can take effect. 5 USC § 801(a)(1)(A). … The CRA allows Congress to review and disap-

prove rules issued by federal agencies for a period of 60 days using special procedures. 5

U.S.C. § 802." Government Accountability Office Decision B-333,501 (Dec. 14, 2021); Ex. 118.

265.    "CDC did not submit a CRA report to Congress or the Comptroller General on the

[FTMM]." *Id*.

266.    The CRA "requires that before a rule can take effect, an agency must submit the rule to

both the House of Representatives and the Senate as well as the Comptroller General, and

provides procedures for congressional review where Congress may disapprove of rules. We

conclude that the [FTMM] meets the definition of a rule for purposes of CRA and, therefore, is subject to CRA's requirements for submission and congressional review." *Id.*

267.    "Here the [FTMM] meets the APA definition of a rule rather than an order. ... despite its label, the [FTMM] is not an order for purposes of the APA because it is not the result of an adjudicatory process." *Id.*

268.    The FTMM "is a rule for purposes of CRA because it meets the APA definition of a rule and no CRA exception applies. Accordingly, before it can take effect, the [FTMM] is subject to the requirement that it be submitted to both Houses of Congress and the Comptroller General for review, which provides Congress a period of 60 days in which it may disapprove the rule using special procedures in accordance with the CRA. While CDC asserted the need to act quickly as its justification for not submitting the Mask Requirement for congressional review, there is not an emergency exception under CRA." *Id.*

269.    Because CDC and HHS did not submit the FTMM rule to Congress and the comptroller general, it has legal effect and must be vacated.

270.    Today (March 15) the Senate voted 57-40 to pass Senate Joint Resolution 37 disapproving of CDC's FTMM order. "[S]uch rule shall have no force or effect." Ex. 119.

271.    A court must "hold unlawful and set aside agency action ... found to be ... without observance of procedure required by law." 5 USC § 706(2)(D).

**Count 5: Violation of the separation of powers: The Public Health Service Act is an improper delegation of legislative power.**

272.    The U.S. Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." Art. I, § 1.

273.    Under the nondelegation doctrine, Congress cannot transfer legislative power to the Executive Branch. Acts of Congress must supply an intelligible principle to guide the Executive Branch's enforcement discretion.

274.    If the Court finds it does authorize the FTMM, § 361 of the Public Health Service Act (42 U.S.C. § 264) violates Article I's Vesting Clause and the separation of powers because Congress delegated legislative power to CDC and HHS with no intelligible principle to guide its discretion. That section authorizes CDC "to make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases … from one State or possession into any other State or possession." 42 USC § 264(a).

275.    If PHSA § 361 is so broad as to authorize the FTMM, then Congress provided no intelligible principle to guide CDC's discretion to take actions that "are necessary" to "prevent the introduction, transmission, or spread of communicable diseases." *Id.* Vesting CDC with such broad authority and discretion without an intelligible principle violates the nondelegation doctrine.

276.    Notably Congress has declined numerous times during the two-year-long COVID-19 pandemic to enact into law any mask requirement. ¶¶ 22-26.

277.    Today (March 15) the Senate voted 57-40 to pass Senate Joint Resolution 37 disapproving of CDC's FTMM order. "[S]uch rule shall have no force or effect." Ex. 119.

278.   The Court should declare that § 361 of the Public Health Service Act is unconstitutional because it violates Article I and the separation of powers.

279.   The Court should hold unlawful and set aside the FTMM because it is "found to be … contrary to constitutional right, power, privilege, or immunity." 5 USC § 706(2)(B).

**Count 6: Violation of the 10th Amendment: The FTMM applies to intrastate transportation in direct conflict with the mask policies of all 50 states, infringes on the states' sovereign police power to regulate public health, and commandeers state officials to enforce a federal order.**

280.   "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. Amend. 10.

281.   The 10th Amendment precludes CDC and HHS from applying any national mask mandate to intrastate transportation. The federal government only has constitutional authority to regulate interstate commerce. Most modes of transportation affected by the FTMM such as airport and hotel shuttles, city buses, subways, light rail, commuter trains, and rideshare cars never cross state lines. Many flights we operate are likewise wholly intrastate, and airport terminals of course do not ever move and therefore can't cross state borders.

282.   In addition to all 50 states not requiring masks, 14 states prohibit any public agency such as an airport or transit authority from requiring face coverings. Ex. 114. The federal government may not pre-empt the states' authority when it comes to regulating public health within their own borders. ¶¶ 229-233.

283.   The FTMM unconstitutionally commandeers state officials such as airport authority employees to enforce a federal mandate.

284.    The Court should declare the FTMM is unconstitutional because it violates the 10th Amendment.

285.    The Court should hold unlawful and set aside the FTMM as "contrary to constitutional right, power, privilege, or immunity." 5 USC § 706(2)(B).

**Count 7: Violation of the Administrative Procedure Act: The FTMM violates federal law prohibiting the mandatory use of any medical device unauthorized or approved under an Emergency Use Authorization by the Food & Drug Administration.**

286.    CDC and HHS force American travelers and transportation workers to use a medical device (face masks), most of which are approved by FDA – an agency within HHS – under Emergency Use Authorization, or have no authorization at all. ¶¶ 192-228.

287.    CDC and HHS failed to consider that airline companies are not individuals with the appropriate ethics and scientific education, training, and qualifications to order passengers and employees to use experimental medical devices unauthorized by FDA or issued under an EUA.

288.    CDC and HHS failed to consider that airline companies are not competent and appropriately qualified physicians or other healthcare professionals able to evaluate who can't medically tolerate covering their nose and mouth.

289.    The FTMM is dangerous because it forces passengers and workers to use a medical device, the vast majority of which are unauthorized or approved by FDA under an EUA.

290.    CDC and HHS, through their partner agency TSA, provide unauthorized and/or EUA masks to passengers and employees, introducing these experimental medical devices into interstate commerce.

291.    Our companies also provide us and passengers with unauthorized and/or EUA masks to comply with the FTMM.

292.   Individuals to whom any EUA product is offered must be given "the option to accept or refuse administration of the product…" 21 USC § 360bbb-3(e)(1)(A)(ii)(III).

293.   The FTMM violates the Food, Drug, & Cosmetic Act by not giving passengers and workers our legal option to refuse administration of an FDA unauthorized or EUA medical device (a face mask).

294.   It's a longstanding principle, codified in law, that it is not permissible to coerce anyone to receive an unlicensed medical product.

295.   Congress specifically carved out only one exception for when an individual would not have the option to accept or refuse administration of an emergency medical device. The law's condition that all people must be given the right to refuse use of an EUA product "may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security." 10 USC § 1107a(a)(1). This provision only applies to "members of the armed forces." *Id*.

296.   We are not members of the armed forces, and the president has not declared that mandatory use of face masks is required for national security.

297.   There's good reason for the law prohibiting forced use of EUA medical devices. Requirements for EUA products are waived for, among other things, "current good manufacturing practice otherwise applicable to the manufacture, processing, packing … of products subject to regulation under this chapter…" 21 USC § 360bbb-3(e)(3)(A).

298.   "Nothing in this section provides the [HHS] Secretary any authority to require any person to carry out any activity that becomes lawful pursuant to an authorization under this section…" 21 USC § 360bbb-3(l). But the FTMM requires us to carry out forced use of EUA masks.

299.    Congress' prohibition of mandatory mask use is consistent with HHS' regulations requiring that participants in trials of experimental medical devices must be informed that "participation is voluntary, refusal to participate will involve no penalty…" 45 CFR § 46.116(a)(8).

300.    Likewise FDA regulations state that no human shall participate in research trials of uncertified medical devices unless "the investigator has obtained the legally effective informed consent of the subject…" 21 CFR § 50.20.

301.    A person may freely choose to accept medical risks for the benefit of others; they cannot be compelled by the federal government. We don't harvest organs without consent, even if doing so would save many lives. Those who make such sacrifices for others must truly be volunteers, not conscripts.

302.    The defendants have no authority to order us to obstruct our breathing as part of our job, causing numerous harms, to perhaps spare another person from catching a virus.

303.    "Protection of others" does not relieve the defendants from the central canon of medical ethics requiring voluntary and informed consent.

304.    The Court should hold unlawful and set aside the FTMM because it violates the FDCA, making it "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 USC § 706(2)(C).

## VI. PRAYER FOR RELIEF

WHEREFORE, we request the Court grant the following relief:

A. Declare Defendants CDC and HHS' Feb. 1, 2021, Federal Transportation Mask Mandate order "Requirement for Persons to Wear Masks While on Conveyances & at Transportation Hubs" (86 Fed. Reg. 8,025 (Feb. 3, 2021)) contrary to statute and unconstitutional, vacate the order, and permanently enjoin its enforcement worldwide.

B. Issue a permanent injunction directing Defendants CDC and HHS to immediately ensure all federal agencies remove all signs informing passengers of the requirement to wear a mask from all airports, transportation hubs, and other locations worldwide as well as to remove from their websites and in all of their publications any references to the Federal Transportation Mask Mandate.

C. Issue a permanent injunction that Defendants CDC and HHS shall not issue any other orders or regulations requiring any person wear a face mask unless such specific authority is enacted into law by Congress.

D. Award us all costs and fees incurred during the prosecution of this lawsuit from the defendants pursuant to 28 USC § 2412 and/or any other applicable statute or authority.

E. Award us attorney's fees (if we later hire an attorney to represent us in this lawsuit) incurred during the prosecution of this lawsuit from any defendant found to have acted outside its legal and/or constitutional authority pursuant to 28 USC § 2412 and/or any other applicable statute or authority; or, if we continue representing ourselves, award us in lieu of attorney's fees reimbursement at the rate of $200 per hour for the time we have spent litigating this matter.

F. Grant such other and further relief as the Court may deem just and proper under the circumstances.

**Certification:** Pursuant to Fed.R.Civ.P. 11, by signing below, we certify to the best of our knowledge, information, and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have  evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable  opportunity for further investigation or discovery; and (4) otherwise complies with the requirements of Rule 11.

Respectfully submitted this 15th day of March 2022.

*Janviere Carlin*

Janviere Carlin, lead plaintiff
93 Londonderry Way
Uxbridge, MA 01569
Telephone: 757-274-3406
E-Mail: jshellie@charter.net

*Jeffery Chandler*

Jeffery Chandler, plaintiff
8263 Minton Ct.
Millersville, MD 21108
Telephone: 443-370-7428
E-Mail: chan_man7@yahoo.com

*Beth Ellis*

Beth Ellis, plaintiff
128 Milk St.
Blackstone, MA 01504
Telephone: 860-912-1284
E-Mail: bricher1@gmail.com

*Cristina Field*

Cristina Field, plaintiff
1155 Dewees St.
Sumter, SC 29150
Telephone: 334-669-9452
E-Mail: flying.cristina@gmail.com

*Gregory Ramola*

Gregory Ramola, plaintiff
5828 Stafford Springs Trail
Orlando, FL 32829
Telephone: 407-694-2767
E-Mail: noniogtitog@aol.com

*Kurt Schuster*

Kurt Schuster, plaintiff
83 White Tail Run
Hopkinton, NH 03229
Telephone: 517-404-8581
E-Mail: schu_fly@comcast.net

*Hal Sims*

Hal Christopher Sims, plaintiff
604 Green Meadow St. N.
Colleyville, TX 76034
Telephone: 817-875-4259
E-Mail:  hcsims@yahoo.com

*Nathan Town*

Nathan Alexander Town, plaintiff
6119 Whimbrelwood Dr.
Lithia, FL 33547
Telephone: 253-389-3217
E-Mail: townn85@gmail.com

*Jean-Michael Trousse*

Jean-Michael Trousse, plaintiff
1913 NE 21st St.
Fort Lauderdale, FL 33305
Telephone: 678-778-3777
E-Mail: jmtrousse@gmail.com

*Collier Yarish*

Collier Yarish, plaintiff
2185 3rd Pl. SW
Vero Beach, FL 32962
Telephone: 772-480-8348
E-Mail: cryarish@yahoo.com

**CERTIFICATE OF SERVICE**

In addition to formal service of process, due to our intent to immediately seek expedited summary judgment to stop enforcement of the Federal Transportation Mask Mandate, I hereby certify that on March 15, I e-mailed this Complaint and all accompanying exhibits to the U.S. Department of Justice attorneys who are defending CDC and HHS in other lawsuits over the FTMM:

Andrew Freidah
Andrew.F.Freidah@usdoj.gov

Michael Gerardi
Michael.J.Gerardi@usdoj.gov

Stephen Pezzi
Stephen.Pezzi@usdoj.gov

Marcia Kay Sowles
Marcia.Sowles@usdoj.gov

*Janviere Carlin*

Janviere Carlin, lead plaintiff